**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **J.R. SHERROD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 04 C 5544** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | **Judge Rebecca R. Pallmeyer** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff J.R. Sherrod claims that he is disabled by a combination of impairments, including back pain from disc disease, knee problems, hypertension, diabetes, poor eyesight, illiteracy, and obesity. He filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for a period of disability, Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. *See* 42 U.S.C. §§ 423(d), 1381a. The parties have filed cross-motions for summary judgment. For the reasons set forth below, Sherrod's motion is granted in part and denied in part, the Commissioner's motion is granted in part and denied in part, and this matter is remanded to the ALJ for further evaluation.

## PROCEDURAL HISTORY

Sherrod applied for SSI on February 19, 1999, (R. 3[1]) and for DIB in March 1999 (R. 1, 60-63), alleging onset of disability on December 23, 1998. (R. 3, 60.) The Commissioner denied both applications initially, (R. 42), and on reconsideration. (R. 47-48.) Sherrod requested a hearing

---

[1] A handwritten notation on page 1 of the Administrative Record indicates that SSI exhibits 1-5, which include Sherrod's SSI application and Social Security Administration ("SSA") determinations regarding it, were unavailable for inclusion in the record.

before an Administrative Law Judge ("ALJ"). (R. 50-51.) During the hearing, held before ALJ John Kraybill on November 15, 2000, Sherrod amended the alleged disability onset date to May 1, 1999. (R. 200-02.) The ALJ rendered an unfavorable decision on February 22, 2001. (R. 13-24.)

The ALJ found that Sherrod suffers from a vertebrogenic disorder[2] which, although "severe" under applicable Social Security Regulations, does not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 23.) Assessing Sherrod's residual functional capacity, the ALJ concluded that Sherrod was unable to perform his past relevant work, but retains the capacity for a slightly restricted range of light unskilled work. (*Id.*) The ALJ found Sherrod's allegations regarding his limitations not credible. (*Id.*) After finding Sherrod capable of performing a significant number of jobs in the national economy, the ALJ ultimately concluded that Sherrod was not disabled. (*Id.*)

The Appeals Council denied Sherrod's request for review on July 16, 2004, (R. 5-8), leaving the ALJ's decision as the final decision of the Commissioner. Sherrod timely filed the present action on August 23, 2004, seeking judicial review of the ALJ's decision.

## BACKGROUND

Sherrod was born on February 18, 1949. He was 51 years old and living with his daughter and young grandson in Elgin, Illinois at the time of the hearing before the ALJ. (R. 201, 204-05, 225.) He attended a one-room schoolhouse in Mississippi, but received only a grade school education[3] before leaving school to work in the fields. (R. 189, 208-09.) At age seventeen he moved to Illinois, and all of his jobs since then have involved physical labor. (R. 209, 214.)

---

[2]     A vertebrogenic disorder is one that arises in the vertebrae (the bones making up the spinal column) or in the veterbral column. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1819 (28th ed. 1994) (hereinafter, "DORLAND'S").

[3]     It is unclear what grade Sherrod reached in school. He testified at his hearing that he had gone as far as the third grade, (R. 208); in application materials and in statements to physicians, however, he stated that he had completed the sixth grade. (R. 98, 189.) The ALJ made no specific finding as to Sherrod's numerical grade level.

Through 1997, he worked mostly as a porter at car dealerships.  (R. 82-85, 93, 101, 215.)  In 1998 Sherrod was employed as a laborer for a heavy equipment rental company, (R. 85, 226, 239), and in 1998 and 1999, he worked as a construction laborer for Lichtenberger Development Corp. ("Lichtenberger").  (R. 85, 205-07, 236.)  Sherrod claims that he stopped working for Lichtenberger in May 1999, (R. 202, 204), and that since then, his income consists only of what his daughter pays him for babysitting and doing odd jobs around the house.  (R. 77, 204-05.)

## A.    Medical History

### 1.    Foot and Knee Injuries

On November 16, 1994, Sherrod was treated at the emergency room of Sherman Hospital in Elgin for an acute contusion to his left knee after a fall at work several days before.  (R. 149.) Sherrod reported difficulty in climbing stairs.  (*Id.*)  The attending physician ruled out any injury to the meniscus, and X-rays revealed no "bony abnormality."  (*Id.*)  Sherrod was discharged with a prescription for the over-the-counter painkiller Motrin.  (R. 149-50.)  In May 1997, Sherrod was treated again at Sherman Hospital's emergency room after he dropped a 25-pound can of paint on his foot at work, causing pain and swelling.  (R. 143.)  Diagnosing a contusion with no fracture, the treating physician prescribed the painkiller Anaprox[4] and recommended an Ace bandage, ice, elevation, and no weightbearing activity for the rest of the day.  (*Id.*)  X-rays also showed a small plantar calcaneal spur.[5]

On May 6, 1998, Sherrod came to the Sherman Hospital emergency room complaining of numbness and some swelling in his lower left leg.  (R. 138.)  The attending physician noted that

---

[4]    Anaprox (generic name Naproxen) is an anti-inflammatory.  *See* http://www.drugs.com/mtm/a/anaprox.html.

[5]    A plantar spur, commonly called a "heel spur," is often associated with plantar fasciitis, a condition causing pain on the bottom of the foot while walking.  *See* http://orthopedics.about.com/cs/footanklesurgery/g/heelspur.htm.

Sherrod "has no knee pain." (R. 137.) Sherrod was diagnosed with paresthesias,[6] and discharged with a prescription for Naprosyn.[7]

## 2.      Back Injury and Related Pain

On October 12, 1998, Sherrod arrived at the emergency room of Sherman Hospital complaining of lower back pain and a right arm strain. (R. 132-33.) Sherrod reported that he had lifted a 200- or 300-pound generator[8] at work several days before. (R. 132.) Although he "was feeling okay" at the time he lifted the generator, he began feeling pain that evening, and over the next several days the pain had increased to the point at which he could not get out of bed without assistance. (*Id.*) The treating physician, Francis McCormack, M.D., found "significant perilumbar spasm and tenderness" in Sherrod's lower back, but no arm problems other than muscle soreness. (*Id.*) The history notes that Sherrod "has had no previous injury to his back." (*Id.*) Dr. McCormack prescribed ibuprofen, Vicodin, and Flexeril,[9] and encouraged Sherrod to apply moist heat (presumably to his back). (*Id.*) Sherrod was not admitted to the hospital, and was discharged with

---

[6]      Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *See* DORLAND'S, at 1234. The sensation is "usually painless and described as tingling or numbness, skin crawling, or itching." NINDS Paresthesia Information Page, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm. Most people have experienced paresthesia as the feeling of "pins and needles" after a limb has "fallen asleep." *Id.*

[7]      Naprosyn, like Anaprox, is a brand name for the anti-inflammatory Naproxen. *See* http://www.drugs.com/mtm/n/naprosyn.html.

[8]      The treating physician's history from the October 12, 1998 visit notes that Sherrod described the generator as "somewhere around 200 pounds." (R. 132.) The nursing record indicates that Sherrod described the generator as 300 pounds. (R. 133.) Sherrod later told State agency physician Dr. Koo that the generator weighted between 200 and 300 pounds. (R. 155.) In a follow-up visit to a specialist on November 11, 1998, Sherrod related having lifted a 400-pound generator. (R. 114.) The record does not indicate whether Sherrod lifted the generator by himself, or with assistance. The court notes, however, that Dr. Koo described Sherrod as "well-developed," (R. 156), and the medical examiner at the hearing called him "very muscular." (R. 228.)

[9]      Flexeril is a muscle relaxant. *See* http://www.drugs.com/mtm/f/flexeril.html. Vicodin, a hydrocodone, is a narcotic pain reliever similar to codeine. *See* http://www.drugs.com/mtm/v/vicodin.html.

instructions that he could return to work the following day, but with no bending, stooping or twisting, and that he should refrain from lifting more than 20 pounds for a week. (R. 135.)

On October 22, 1998, Sherrod complained to his family physician, Jeffrey L. Garb, M.D., of continuing low back pain. (R. 3, 179-80.) Dr. Garb referred Sherrod to James B. Mansfield, M.D., a board-certified neurological surgeon. (R. 114,180, 185.) When he saw Dr. Mansfield on November 11, 1998, Sherrod reported that he had "felt something snap in the right side of his back and right shoulder" when he picked up the generator, and that since then, he had had intermittent pain in those areas, with the pain radiating down his right upper arm and into his right leg to the calf. (R. 114.) Sherrod said he had not returned to work. (*Id.*) He asserted that the back pain, which he described as "much worse" than the arm pain, caused him to walk in a "twisted fashion." (*Id.*) Dr. Mansfield noted "some guarding in the right leg," but observed that Sherrod's "gait was normal." (*Id.*) His initial impression was of a lumbar and cervical strain with lumbar disc herniation,[10] and he recommended an MRI of Sherrod's lumbar spine.[11] (*Id.*) Dr. Mansfield characterized Sherrod as of "normal intelligence." (*Id.*)

Sherrod had the MRI on November 16, 1998. (R. 113.) According to notations made by Gabriel Angres, M.D., the scan showed "minimal broad based disc bulging and/or protrusion of less than 3 mm at the L4/5 level" with minimal disc degeneration and "no evidence of significant nerve root compression." (*Id.*) Reviewing the results on November 17, 1998, Dr. Mansfield concluded that the MRI was "normal save for some degeneration of the L4 disc" and cleared Sherrod to return to work the following day. (R. 114.) Dr. Mansfield apparently did not recommend any restrictions on Sherrod's bending or lifting.

On June 11, 1999, State agency physician Dr. Kyung W. Koo conducted a consultative

_____

[10] Disc herniation occurs when the semifluid nucleus of the disc protrudes through the disc, possibly impinging on nerve roots. *See* DORLAND'S, at 759, 1159.

[11] The lumbar spine is the part of the spine between the thorax and the pelvis. *See id.* at 961.

examination ("CE") of Sherrod at the request of the Social Security Administration ("SSA"). (R. 18, 155-56.) Sherrod told Dr. Koo that he had "not been followed up regularly" nor received treatment since the consultation with Dr. Mansfield, but that he continued to experience pain in his lower back, radiating down his right leg, as well as pain in his right arm with numbness and tingling in his right hand. (R. 155.) He related that he could not bend over and was in constant pain, even at rest. (*Id.*) He asserted that he had not returned to work after the incident with the generator. In the examination, Dr. Koo found that Sherrod was able to bend forward 90 degrees and backwards 30 degrees, but only with pain in his lower back. (*Id.*) Straight leg raising was limited to 45 degrees with the right leg, but was not limited with the left. (*Id.*) Noting that the MRI showed "disc bulging at [the] L4-L5 level," Dr. Koo concluded that Sherrod "had great difficulty in bending over and is not able to lift any heavy object, for example weighing more than 20 to 30 lbs. because of the lower back pain. In addition, he does have cervical radicular pain in the right upper extremity but there are no positive physical findings." (*Id.*)

On January 16, 2000, Sherrod visited the emergency room at St. Joseph Hospital in Elgin, complaining of pain in his right neck, ribs, and leg. (R. 159-60.) Sherrod described having fallen "5 feet inside a house" three days earlier. (R. 160.) Reporting Lichtenberger as his employer and "construction" as his occupation, he said he had been "scraping a house in St. Charles" when he fell. (R. 159.) He was diagnosed with a chest wall contusion, and released with instructions to rest, take Tylenol, and avoid heavy lifting. (R. 160.) The records for this visit contain no reference to back pain or to his previous back injury.

### 3. Kidney Stones

On September 23, 1996, Sherrod came to the St. Joseph emergency room complaining of kidney pain. (R. 163.) The medical records from this visit contain diagnostic imaging and various blood and urine chemistry lab tests, but no report or summary of results. (R. 167-71.) He was

apparently discharged the same day with prescriptions for Floxin,[12] an antibacterial medication, and the painkiller Vicodin. (R. 164-66.) On February 24, 1999, Sherrod arrived at the emergency room of Sherman Hospital with flank pain and blood in his urine and was admitted to the hospital for four days; tests revealed kidney stones. (R. 116.) He received treatment, including the placement of a ureteral stent. (*Id.*) He was given a prescription for Vicodin and discharged on February 28, 1999. (R. 117.) The stent was removed on March 29, 1999. (R. 128.) Sherrod returned to Sherman Hospital's emergency room on April 22, 1999, with similar pain. (R. 121.) Treating physicians gave him another prescription for Vicodin, instructions to see a urologist within 36 hours, and "standard kidney stone instructions" including directions to drink large quantities of fluids and strain his urine. (R. 121-23.)

### 4. Diabetes, High Blood Pressure, and Obesity

Sherrod was diagnosed with diabetes mellitus in 1994. (R. 118, 156, 172.) A medical history taken in November 1994 characterized his diabetes as "insulin dependent" and lists "insulin" under "medications." (R. 149.) More recently, however, Sherrod has reported taking only oral diabetes medication: Glucotrol on May 22, 1997, (R. 146); Glynase on October 12, 1998, (R. 133), and February 24, 1999, (R. 118); and Glyburide on September 23, 1996, (R. 164), October 22, 1998, (R. 179), January 18, 2000, (R. 178), February 15, 2000, (R. 176), and March 23, 2000.[13] (*Id.*) On May 6, 1998, Sherrod reported taking "oral antihyperglycemic medication every other day just about." (R. 137.) On an undated claimant's statement filed with his hearing request, however, Sherrod checked the "no" box when asked whether he was taking any prescription drugs or medications. (R. 107.) The medical history taken during Sherrod's emergency room visit on

---

[12]    Floxin (generic name Ofloxacin) is used to treat bacterial infections, including those in the urinary tract. *See* http://www.drugs.com/mtm/f/floxin.html.

[13]    Glyburide and Glucotrol are used to treat Type-II diabetes by controlling blood sugar levels. *See* http://www.drugs.com/glyburide.html; http://www.drugs.com/mtm/g/glucotrol.html. Gyburide is the generic name for Glynase. *See* http://www.drugs.com/mtm/g/glynase_prestab.html.

October 10, 1998, after he lifted the generator, indicates that Sherrod's diabetes was "controlled with oral hypoglycemics." (R. 132.) The history from his kidney stones visit on February 24, 1999 states that Sherrod "has had no complications from the diabetes." (R. 118.)

Medical records from Sherrod's trip to the emergency room on May 22, 1997, the day he dropped the paint can on his foot, note a history of hypertension in addition to diabetes. (R. 143.) In his consultation with Dr. Mansfield on November 11, 1998, Sherrod reported taking unidentified medication for hypertension. (R. 114.) On June 11, 1999, however, Sherrod told state agency physician Dr. Koo that although he had been diagnosed with hypertension in 1994, he had not been taking any antihypertensive medication. (R. 155.) There is no other reference to hypertension medication in Sherrod's medical records; indeed, on the occasions where he reported taking diabetes medication, as noted above, Sherrod did not report taking any medication for hypertension. Sherrod's medical history from his visit to the emergency room for kidney stones on February 24, 1999 contains no reference to hypertension, (R. 118); in the next kidney-stones-related visit on April 22, 1999, however, the medical history notes a family history of hypertension, blood pressure readings of 151/107 and 144/100, and verbal instructions for Sherrod to have his blood pressure rechecked in a week. (R. 121.)

There is no specific diagnosis of obesity in Sherrod's medical records. Dr. Koo, however, in the CE observed that at 5'7-1/2" and 250 pounds, Sherrod was "overweight," albeit "well-developed." (R. 156.)

## B. Other Documentary Evidence at the Hearing

Sherrod's fiancee, Gladys Isabell,[14] submitted a letter on his behalf, addressed to Sherrod's

_____

[14] Sherrod's relationship to Gladys Isabell is not entirely clear. In emergency room visits on September 23, 1996 and January 16, 2000, Sherrod listed Gladys Isabell as his "fiancee" when asked for "next of kin." (R. 159, 163.) When he came to the emergency room on October 12, 1998, after the generator incident, he said his "wife" had to help him out of bed, (R. 132), and when giving a family history to Dr. Koo on June 11, 1999, he said his "wife is well." (R. 156.) In his DIB application materials, he listed his relationship to Ms. Isabell as "friend," (R. 91), indicated he had never been married, (R. 65), and identified Ms. Isabell as the mother of his two children. (R.

attorney. (R. 105, 211.) She wrote that Sherrod has very poor eyesight, and that he could not "read or write anymore." (R. 105.) She claimed that she reads Sherrod's mail for him, and fills out forms and paperwork.[15] (*Id.*) Her letter states that Sherrod has trouble "getting around" because of his knees and back; that he has difficultly walking because "his feet swell"; and that he could not work "because of his disability to lift, bend, stand and even walk." (*Id.*)

## C.    Sherrod's Testimony

At the hearing before the ALJ on November 15, 2000, Sherrod was represented by attorney David Greenberg. (R. 200.) At the outset, Greenberg told the ALJ that Sherrod had worked for Lichtenberger until May 1999, rather than ceasing employment in December 1998 as Sherrod had indicated in his applications. (R. 201-02.)

Sherrod testified he went as far as the third grade in school. (R. 208.) When the ALJ asked why he had indicated on his DIB application that he had completed the sixth grade, he responded,

> Where I was growing they would give you like, I guess two grades or three grades, you know, just to keep you going because, you know, it was so – we only had like one room that they would have like 20 or 30 kids in a room maybe a little bigger than this here. So they didn't keep you there very long. So they would just pass you on down, which if you could read or write either way, you just had to go – keep going.

(R. 209.) Sherrod testified that he had never been able to read and write, and that he had always needed someone to fill out job applications for him. (R. 212.) When asked why Gladys Isabell had written that he could not read or write "anymore," Sherrod testified that he had pretended, out of embarrassment, to be able to read and write when he first met Ms. Isabell. (*Id.*) Sherrod stated that he did not wear glasses, but that he needed to; he denied, however, that his eyesight was the reason why he could not read, maintaining that he "just can't read." (R. 211-12.) When asked the name of his personal physician, Sherrod replied "Dr. Garb. . . . G-o-r — I can't spell his name." (R.

---

77, 217.) At his hearing, however, he testified that only his daughter and grandson lived with him, (R. 204), and that Ms. Isabell was his "fiancee." (R. 211.)

[15]      It does not appear that Ms. Isabell filled out Sherrod's Social Security applications; his DIB application was prepared by a paralegal at Sherrod's attorney's firm. (R. 63, 100, 103.)

221.)

Sherrod testified that he never applied for food stamps or public aid because he could not read the applications and did not want to ask Ms. Isabell or his daughter to go with him to apply. (R. 213.) He has never received welfare, (*id.*), nor applied for unemployment benefits. (R. 207.)

Sherrod further testified as to his work history. He stated that since moving to Illinois at the age of seventeen, he had worked only as a laborer in jobs that required lifting more than 50 pounds. (R. 209, 214.) His work as a porter for car dealerships consisted largely of buffing, waxing, and shampooing the cars, which involved a great deal of stooping and bending. (R. 215.) He often had to lift and carry a 35-40 pound buffer by himself, as well as containers of soap and rustproofer that weighed more than 50 pounds. (R. 216, 231.) Sherrod also indicated that he had held a number of "construction laborer" jobs in the past fifteen years, all of which involved lifting more than 50 pounds. (R. 233.)

Sherrod characterized the construction laborer job with Lichtenberger as working for a "friend." (R. 206, 234.) According to Sherrod, "it was a job like he made up for me," because his friend "knew about how my health was." (R. 235.) The job involved "sweeping up the basement and stuff like that," but also "lifting and carrying stuff," often with the aid of his employer-friend's brother, at home-building construction sites. (R. 205, 207-08, 235-36.) Greenberg, Sherrod's attorney, characterized the work as "a full-time job" that paid $10 an hour, where Sherrod was "sort of a jack of all trades on this guy's construction site." (R. 201.) Sherrod testified that he stopped working for his friend (and thus Lichtenberger) in May 1999, (R. 204, 236), when his friend stopped calling him to offer work once Sherrod was no longer able to lift and carry, (R. 207); his friend told Sherrod he needed "a younger guy" who wouldn't rely on the brother for help lifting things. (R. 237.) Sherrod testified that his knees were "giving out," that his knees and ankles were "swelling up," and that he had trouble catching his breath when climbing stairs. (R. 207.) The ALJ questioned Sherrod about the fact that although he now claimed not to have worked since May 1999, the

hospital record from Sherrod's emergency room visit in January 2000 listed Lichtenberger as his employer and stated that he had been "scraping a house" when he fell and injured himself. (R. 205-06.) Sherrod denied that he had been working for Lichtenberger in January 2000, and maintained that it was actually January 1999 when he worked for Lichtenberger. (*Id.*) Attorney Greenberg asserted that the medical report did not actually "say that [Sherrod] fell at work or anything," and suggested that Sherrod listed Lichtenberger only as his insurance carrier, and not as his employer. (R. 206.)

When asked what he felt were the "main problems" preventing him from continuing to work, Sherrod responded "my knees and ankle and stuff like that. I couldn't stand; I couldn't lift too many pounds no more. The side of my leg get numb and my toes, and my right hand's fingers swell up and stuff. And I get short of breath." (R. 208.) He did not mention his back. Sherrod said he had been "working all his life," was "not scared of working," and would work if he could. (R. 213.)

As for daily activities, Sherrod testified that he has trouble going up and down the stairs to his third floor apartment because of the problems with his knees and ankles. (R. 204.) He said his daughter gives him "a little five or ten bucks . . . to clean up around the house and stuff like that" and care for his grandson after school. (R. 204.) He testified that he has a driver's license and drives, but "not too long," and that he has no medical insurance. (R. 205.) Around the house, he washes dishes until he gets tired and sweeps occasionally, but his daughter does the laundry and the grocery shopping. (R. 210.)

Sherrod testified that he takes Glyburide for his diabetes, (R. 211), and that he also "take[s] high blood," but that Dr. Garb had not given him those pills before going on vacation. (R. 211, 213.) He said that because of high blood pressure, he sometimes gets "real dizzy" when he bends over, and gets "a lot of headaches." (R. 213-14.) He also testified to suffering from constant and daily pain, numbness, and swelling in his knees, ankles, side, hands, and fingers. (R. 214-15.) He characterized the back and leg pain as mostly occurring on his left side, but testified that it was his

right hand that became numb. (R. 218.) He indicated that he had been taking unidentified "pain pills" twice a day, which helped sometimes, but that his prescription had run out. (R. 214.)

Sherrod said that after Dr. Mansfield examined his back, "the company I was working for,[16] they sent me to all these doctors to find out what was wrong with me." (R. 223.) Sherrod could not recall any of these doctors' names, but remembered that one doctor "put some needles" in him, and that another doctor at Sherman Hospital told him he needed back surgery, which he declined. (R. 223-25.)

## C. Medical Expert's Testimony

Dr. Irving Zitman, M.D. testified as a medical expert ("ME") at the hearing. With regard to Sherrod's back, Dr. Zitman testified that Sherrod had a discogenic disease[17] of the spine, but that it was difficult to assess its severity based on the medical records he had before him. (R. 227, 229.) He acknowledged that Sherrod's MRI showed bulging discs, but observed that bulging discs are "a rather normal finding." (R. 227.) He also noted, however, that if Sherrod's doctors were considering surgery on his back, those doctors "could have arrived at a level much more severe that [*sic*] I can assess from what's in this file." (*Id.*)

Dr. Zitman testified that Sherrod had diabetes mellitus Type-II, for which he was taking Gyburide, and that although he did not know how well the diabetes was controlled, there was no evidence of end-organ disease. (R. 227-28.) According to Dr. Zitman, Sherrod has "moderate" hypertension. (R. 228.) He observed that Sherrod was "quite obese" but also "very muscular." (R. 228.) Dr. Zitman also stated that Sherrod has symptoms of a left-sided neuropathy.[18] (R. 229)

---

[16]     Sherrod did not identify which company sent him to the doctors, but he testified elsewhere that he had been working for A to Z Rentals, a heavy equipment rental company, when he hurt his back. (R. 226.)

[17]     A discogenic condition is caused by derangement of an intervertebral disc. DORLAND'S, at 477.

[18]     A neuropathy is "a functional disturbance or pathological change in the peripheral nervous system." *Id.* at 1132.

Dr. Zitman concluded that Sherrod should not lift more than 20 or 30 pounds. (R. 229.) He opined that Sherrod could lift 20 pounds occasionally, and ten pounds frequently, and occasionally squat, but that Sherrod could not flex more than 90 degrees and would have difficulty lifting objects from ground level. (R. 229.) Dr. Zitman testified that he could not provide "a real good assessment on [Sherrod's] ability to walk and stand six hours a day[,]" but that he would "have to go along with six[19] on the basis of the medical evidence at the moment." (R. 229-30.)

Dr. Zitman also criticized the CE conducted by Dr. Koo, calling it a "very poor" CE that "shouldn't have been paid for." (R. 228-29.) He stated that Dr. Koo should have performed a visual acuity test. (R. 228.) Dr. Zitman questioned Dr. Koo's observations of right leg pain and Dr. Koo's finding that Sherrod's ability to raise his legs was limited on the right side but not on the left: according to Dr. Zitman, these findings "should have been the other way around[,]" given Sherrod's symptoms of sciatic-type pain radiation down his left leg. (*Id.*) He conceded, however, that "[d]octors do make mistakes sometimes writing right or left." (*Id.*)

**D.    Vocational Expert's Testimony**

GleeAnn Kehr testified at the hearing as a vocational expert ("VE"). (R. 230-41.) Ms. Kehr characterized Sherrod's job with Lichtenberger as a "makeshift position" that his friend "created out of the goodness of [his] heart." (R. 237.) She testified that all of Sherrod's past jobs were heavy in physical demand and unskilled. (R. 239.) The ALJ then posed a hypothetical, asking Ms. Kehr how many jobs would be available for a 49- to 51-year-old man with a sixth grade education and Sherrod's work experience, who was literate and able to communicate in English,[20] who was limited

---

[19]    Dr. Zitman does not identify with whom he is "go[ing] along." Dr. Koo did not in his CE provide an opinion as to whether Sherrod could walk or stand six hours. As Dr. Zitman had just stated that Sherrod was "a light," he may have had in mind Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5-6, which defines "light work" in part as work that requires standing or walking six hours out of an eight-hour workday.

[20]    The VE apparently assumed at first that Sherrod was illiterate, and observed that an individual with Sherrod's vocational profile and limitations would have been deemed "disabled" under the Grid Rules of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P,

to lifting 20 pounds occasionally and ten pounds frequently, who could stand or walk for six of eight hours, and who could only occasionally squat or lift from the floor.  (R. 239-40.)  The VE testified that there were approximately 8,000 such jobs: 5,000 as a machine operator, 2,000 as an assembler, and 1,000 as a clothes room worker.[21]  She noted that these positions were "just some examples."  (R. 241).

## E.    Further Development of the Record

After Ms. Kehr's testimony, the ALJ indicated that the record required further development. (R. 241.)  With regard to Sherrod's back injury, ALJ Kraybill expressed interest in obtaining more material from "[t]his Dr. Mansfield . . . and there's also references to an MRI and possible EMGs that may have been done."  (*Id.*)  The ALJ also questioned whether Sherrod's claimed inability to read and write was due to a visual impairment.  (R. 242.)  Greenberg, Sherrod's attorney, suggested that Sherrod's literacy could be tested with a psychological evaluation.  (R. 243.)

On November 30, 2000—about two weeks after the hearing—attorney Greenberg faxed two documents to ALJ Kraybill for the purpose of "confirming the claimant's illiteracy."  (R. 186.)  The first was a short note from Dr. Garb, dated November 21, 2000, in which Dr. Garb, under Sherrod's name, wrote "states cannot read or write."  (R. 187.)  The second was an undated letter from Sherrod's daughter Melanie, who wrote that Sherrod could never help her or her sister with their homework because "he is unable to read or write."  (R. 188.)  She wrote that Sherrod would never be able to read his grandchildren a story or help them with homework, and that when they went to a restaurant together, he could not read the menu and she would have to read it to him.  (*Id.*)

On December 29, 2000, Randy L. Kettering, Ph.D., conducted a psychological CE of

---

Appendix 2.  (R. 240.)  The ALJ directed the VE to consider a literate individual who was able to communicate in English for purposes of the hypothetical.  (*Id.*)

[21]     The ALJ did not elicit testimony from the VE as to whether these 8,000 jobs were in the national or regional economy.  The VE had previously defined the relevant region as "the Chicagoland area and the six surrounding counties."  (R. 230.)

Sherrod at the request of the SSA. (R. 20,189.) Dr. Kettering noted that Sherrod arrived unaccompanied and early to the appointment; Dr. Kettering emphasized that he "did not have to give [Sherrod] instructions on how to find the office." (R. 189,194 (emphasis in original).) Sherrod did not wear eyeglasses, and Dr. Kettering was unaware of Sherrod's level of visual acuity. (R. 189.) Sherrod told Dr. Kettering that he had attended school "until 6th grade." (R. 189.)

Dr. Kettering conducted two memory tests, and two achievement and intelligence tests. The results of the Rey 15-Item Memory test, which Dr. Kettering used to "assess the validity of memory complaints and malingering," suggested that Sherrod "may have been putting forth less than his maximal effort." (R. 189.) In the Test of Memory Malingering, used to "assess whether an individual is falsifying symptoms of memory impairment or malingering," Sherrod's score was 29; Dr. Kettering noted that very few people, even those with "severe cognitive defects," scored below 45. (R. 190.) Dr. Kettering observed that Sherrod's score "suggests that he may be attempting to portray himself in an unfavorable light on tests measuring his ability to learn and retain information." (*Id.*)

On the Wide Range Achievement Test, Sherrod performed at a first-grade level in reading, spelling and arithmetic. (*Id.*) Dr. Kettering noted, however, that it was "possible that his performance [on the arithmetic test] was compromised by visual acuity in misreading a '-' for a '+' but he did not do so consistently." (R. 190.) On the Wechsler Adult Intelligence Scale, Dr. Kettering found that Sherrod's intellectual functioning was in the "Extremely Low" range, and that the test results classified him as "mildly mentally retarded." (R. 191.) Dr. Kettering doubted these results, noting that Sherrod was "only educationally deprived and not cognitively impaired." (R. 191.) He noted that Sherrod could not define the word "penny," (R. 191), and doubted the "veracity of [Sherrod's] performance" in part because Sherrod claimed not to know why Martin Luther King, Jr. was famous. (R. 192.) Because Sherrod's performance in the memory tests "raise[d] serious concern as to whether Mr. Sherrod was putting forth his best effort," Dr. Kettering concluded that

the results of the intelligence and achievement tests were "somewhat suspect." (R. 190.)

Providing a Mental Assessment, Dr. Kettering concluded that Sherrod's ability to understand, remember, and carry out instructions, as well as his ability to respond to supervision and work pressures, were unaffected by any impairment. (R. 193-94.) He stated, however, that Sherrod's reading capabilities were impaired, and that he would "require verbal instruction on tasks to be completed." (R. 194.)

## F.    The ALJ's Findings

### 1.    The Five-Step Test

The Social Security Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The SSA has promulgated regulations establishing a five-step sequential evaluation process to determine disability:

(1) whether the claimant is currently engaged in "substantial gainful activity";
(2) whether the claimant has a "severe impairment";
(3) whether the impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;
(4) whether the claimant can perform past relevant work;
(5) whether the claimant can perform other jobs in the national and local economy.

*See* 20 C.F.R §§ 404.1520(a)(4)(i-v) (governing claims for DIB), 416.920(a)(4)(i-iv) (parallel regulation governing claims for SSI); *see also Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). If at any step the ALJ can make a conclusive finding of disability or non-disability, the ALJ need not progress to the next step. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 404.1520(a)(4). A "severe impairment" for purposes of step two is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (quoting 20 C.F.R. § 404 .1520(c)). If the ALJ determines in step three that an impairment that qualified as "severe" in step two meets or equals one found in the list of

impairments in Appendix 1, the claimant is presumed disabled and the inquiry ends.[22]  *Barnhart*, 540 U.S. at 24-25; 20 C.F.R. § 404 .1520(d).  If the impairment does not meet or equal one on the list, steps four and five require the ALJ to consider the claimant's residual functional capacity ("RFC").  *Barnhart*, 540 U.S. at 25 & n.1; *Young*, 362 F.3d at 1000; 20 C.F.R. § 404.1520(e).  The RFC determination involves an assessment of what work-related activities the claimant can perform despite the claimant's limitations.  *Young*, 362 F.3d at 1000; 20 C.F.R. § 404.1545(a)(1).  If the claimant can perform the kind of work the claimant has done in the past, the claimant is deemed not disabled after step four.  *Barnhart*, 540 U.S. at 25; 20 C.F.R. § 404.1520(f).  The burden of proof rests on the claimant through step four, and only shifts to the Commissioner at step five, where the Commissioner must show that the claimant can successfully perform a significant number of jobs that exist in the national economy.  *Young*, 362 F.3d at 1000 (citing *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)); 20 C.F.R. § 404.1560(c).

### 2. The ALJ's Determination

In this case, ALJ Kraybill proceeded through all five steps in concluding that Sherrod is not disabled withing the meaning of the Social Security Act.  At step one, the ALJ noted that there was evidence "clearly indicat[ing]" that Sherrod had engaged in qualifying "substantial gainful activity" beyond the (amended) disability onset date of May 1, 1999: namely, the medical records from Sherrod's emergency room visit in January 2000 in which Sherrod reported Lichtenberger as his employer and "construction" as his occupation, and related having recently fallen while scraping a house.  (R. 17-18, 21.)  Nonetheless, the ALJ, observing that no development had been done to determine the time period during which Sherrod had performed this kind of work, decided to "give [Sherrod] the benefit of every doubt" in finding that any unreported construction did not constitute disqualifying gainful activity.  (R. 17-18.)

---

[22]     Appendix 1 lists fifteen categories of impairments, setting forth diagnostic and documentary criteria required for a finding that an impairment constitutes a disability at step three. 20 C.F.R. Pt. 404, Sbpt. P, App. 1.

At step two, the ALJ found that Sherrod suffers from "mild" hypertension, diabetes mellitus, and a history of kidney stones, but concluded that these impairments, while medically diagnosed, imposed no functional restrictions on Sherrod's ability to work and therefore were not "severe." (R. 18.) The ALJ did find that Sherrod has a vertobrogenic disorder that qualifies as a "severe" impairment. (*Id.*) At step three, however, the ALJ concluded, without elaboration, that Sherrod's disc condition was "not severe enough" to "meet or medically equal" any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ did not specify which listings in Appendix 1 he considered when making this determination.[23]

Proceeding to consider Sherrod's RFC, the ALJ concluded that Sherrod retains the RFC to perform a "somewhat restricted range of light unskilled work." (R. 23.) The ALJ evaluated Sherrod's limitations in light of the medical opinions and history relating to Sherrod's back problems, diabetes, and hypertension,[24] as well as Sherrod's own complaints, including limitations from illiteracy and pain. (R. 18-19.) The ALJ did not discuss obesity. Evaluating the medical evidence first, the ALJ observed that Sherrod had suffered no complications from his diabetes and that the ME, Dr. Zitman, had found no evidence of end organ damage; therefore, the diabetes was "properly controlled on oral medication and imposes no restrictions on [Sherrod's] ability to work." (*Id.*) The

---

[23]     The court notes that Section 1.00 of Appendix 1 addresses musculoskeletal system disorders generally, and that Section 1.04 addresses spinal disorders in particular. 20 C.F.R. Pt. 404, Sbpt. P, App. 1 § 1.04. Relevant disorders listed in Section 1.04 include

> herniated nucleus pulposus [or] degenerative disc disease . . . resulting in compromise of a nerve root . . . .With . . . [e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

*Id.* Although the Seventh Circuit has recently held that an ALJ's failure to mention the specific listings he considered at step three, may, when combined with a "perfunctory analysis," require a remand, *see Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006), Sherrod does not challenge the ALJ's step three determination.

[24]     Although the ALJ acknowledged Sherrod's hospitalization for kidney stones, (R. 18), he did not discuss whether this ailment imposed any functional limitations.

ALJ acknowledged that Sherrod's medical records indicated "some hypertension," but concluded that it was "not uncontrolled" and had "caused no end organ damage." (R. 19.) With regard to Sherrod's back problems, the ALJ noted that Dr. Mansfield had diagnosed a lumbar and cervical strain, that Sherrod's MRI was "within normal limits" except for showing disc bulging, and that Dr. Koo had found Sherrod's muscle tone in his legs equal and normal, and his gait normal. (R. 18-19.) The ALJ observed that Dr. Zitman had agreed with Dr. Koo that Sherrod retained the capacity to "perform the lifting requirements of light work," albeit with restrictions in squatting and picking objects up from ground level, and that Dr. Zitman had further concluded that Sherrod could walk and/or stand for six hours out of an eight-hour workday. (R. 19.) The ALJ gave "very substantial weight" to Dr. Zitman's opinion. (R. 21.)

Turning to Sherrod's own claims of limitations, the ALJ found Sherrod generally not credible. (*Id.*) The ALJ noted several "troublesome inconsistencies that belie the claimant's veracity[,]" including that Sherrod testified that he had completed the third grade, but had told Dr. Koo that he had six years of education, (R. 10); that the January 2000 emergency room records indicated that Sherrod was working construction for Lichtenberger well past when he testified that he had stopped working, (R. 21); that a review of Sherrod's earnings record showed he failed to report or pay taxes on earnings in 1999, despite Sherrod's admission that he had worked until May 1999, (*id.*); and that Sherrod reported taking no prescription medication in a statement included with his request for a hearing, even though he testified as to taking Glyburide. (*Id.*) The ALJ also observed that Dr. Koo made "no positive physical findings" to corroborate Sherrod's complaints of pain. (R. 19.)

With regard to Sherrod's specific claims of limitations, the ALJ concluded that Sherrod was not illiterate. (R. 19.) The ALJ was not persuaded that Sherrod was "unable to read a simple note or do anything more than sign his name." (*Id.*) In reaching this conclusion, the ALJ relied heavily on the results of Dr. Kettering's CE, which he found "quite persuasive." (R. 20.) In particular, the ALJ gave weight to Dr. Kettering's opinion that Sherrod was deliberately attempting to portray his abilities in an unfavorable light, which rendered Sherrod's low test results suspect. (*Id.*) The ALJ

noted the inconsistency between the CE findings of low functional intelligence and Dr. Mansfield's observation of "normal intelligence," and found it "totally implausible" that Sherrod could not define a "penny" and could not "give any pertinent information about Martin Luther King." (*Id.*) The ALJ further found it significant that Sherrod had apparently driven himself to the appointment at Dr. Kettering's office in Arlington Heights:[25] "Since [Dr. Kettering] is not one of [Sherrod's] treating physicians, [he] would not be familiar with the route to the office . . . .Finding a strange office in a strange town, in an unfamiliar building is not something that would plausibly be attempted by someone who is either totally illiterate or mentally retarded." (R. 21.)

The ALJ also noted that nothing in the medical records confirmed that Sherrod was illiterate, and characterized Dr. Garb's note as merely a "rote recitation" of Sherrod's claim that he could not read or write. (R. 20.) The fact that Sherrod was unable to help his daughter with her schoolwork was insignificant, in the ALJ's view, because many literate people are also unable to do so. (R. 19-20.) The ALJ considered it "noteworthy" that Sherrod would try to spell Dr. Garb's name at the hearing. (R. 20.) Finally, the ALJ speculated that Sherrod's inability to read might be due to "sub-optimum visual acuity"; he noted that Sherrod testified that he needs glasses but does not wear them, that Ms. Isabell wrote that Sherrod has poor eyesight and cannot read or write "anymore," and that Dr. Kettering observed that Sherrod may have misread "+" and "-" signs. (R. 20-21.)

Based upon Sherrod's RFC for light exertion and the VE's testimony that all of Sherrod's past jobs were heavy and unskilled, the ALJ at step four of the disability determination found Sherrod incapable of performing any of his past relevant work. (R. 22.) The ALJ did not find Sherrod disabled pursuant to the "Worn Out Worker Rule," 20 C.F.R. §§ 404.1562, 416.962, because the rule requires 35 years of arduous physical work and there was no evidence that Sherrod performed such work full time in 1960-65, 1967, 1974, 1975, or 1980. (*Id.*)

---

[25]    Dr. Kettering's Arlington Heights office is approximately twenty-five miles from Sherrod's Elgin home. *See* Yahoo! Local Maps, http://maps.yahoo.com/dd_result? newaddr=1675+Mulberry+Ct&taddr=11+west+college+drive&csz=Elgin%2C+IL+60123-7015&country=us&tcsz=arlington+heights%2C+il&tcountry=us&terr=3003.

Proceeding to step five, the ALJ noted that Sherrod, who was 52 years old at the time of the decision, was "an individual closely approaching advanced age" under 20 C.F.R. §§ 404.1563 and 416.963, with a "marginal education" and "no transferable skills." (R. 22.) Based on the VE's testimony, which he characterized as establishing that 8,000 jobs existed in the regional economy for an individual with Sherrod's limitations and vocational profile, and also applying Grid Rule 202.10 of the Medical-Vocational Guidelines,[26] the ALJ concluded that jobs existed in the national and regional economy that Sherrod could perform. (*Id.*) Accordingly, Sherrod was not disabled within the meaning of the Social Security Act.

## DISCUSSION

### A.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court does not engage in its own analysis of whether Sherrod is disabled. *Young*, 362 F.3d at 1001 (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Nor will it "reweigh evidence, resolve conflicts in the record, decide

---

[26]    The Grid Rules of the Medical-Vocational Guidelines provide a framework for classifying a claimant as disabled or not disabled, based on the claimant's physical capacity, age, education, and work experience. 20 C.F.R. Pt. 404, Sbpt. P, App. 2 § 200.00(a); *see Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). The Grid Rules are employed at step five of the disability test to assist the ALJ in determining if the claimant can engage in work which exists in the national economy. *See* SSR 83-10, 1983 WL 31251, at *1. If the ALJ's factual findings "coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Pt. 404, Sbpt. P, App. 2 § 200.00(a). Where a claimant does not precisely match all the criteria in a Grid Rule, use of the grids is not mandatory and the ALJ can consider the grids along with the testimony of the VE and other evidence. *Haynes v. Barnhart*, 416 F.3d 621, 628 (7th Cir. 2005).

Grid Rule 202.10 assumes a claimant "closely approaching advanced age" (50-54 years old), with an RFC limited to "light work," a "limited" education, who is literate and able to communicate in English, and who is unskilled or who has no pervious work experience; this rule directs a finding of "not disabled." 20 C.F.R. Pt. 404, Sbpt. P, App. 2 § 202.10. Grid Rule 202.09 directs a finding of "disabled" under the same profile but where the claimant is illiterate. 20 C.F.R. Pt. 404, Sbpt. P, App. 2 § 202.09.

For purposes of the Grid Rules, "light work" is defined as work that requires lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, or that requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday" with intermittent sitting in the remaining time. SSR 83-10, 1983 WL 31251, at *5-6.

questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is substantial "if a reasonable person would accept it as adequate to support the conclusion." *Id.* (citation omitted).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the decision to ensure that the ALJ has "articulate[d] some legitimate reason for his decision" and built an "accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). Where the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

**B.     Analysis**

Sherrod argues that the ALJ's decision should be reversed because the ALJ failed to fully develop the record, (Plaintiff's Memorandum in Support of his Motion for Summary Judgment (hereinafter "Pl.'s Mem."), at 10), relied upon numerous factual errors, mischaracterizations of the evidence, and unreasonable inferences, (*id.* at 13), made a finding regarding Sherrod's literacy that was unsupported by the evidence, (*id.* at 13-14), erred in his credibility determination, (*id.* at 15-16), and failed to consider Sherrod's impairments in combination. (*Id.* at 16-17.) The Commissioner contends that the ALJ adequately developed the record and properly considered all relevant evidence, (Defendant's Response to Plaintiff's Motion for Summary Judgment and Cross-motion for Summary Judgment (hereinafter, "Def.'s Resp."), at 10), and that substantial evidence supports the ALJ's credibility and literacy findings, (*id.* at 11), and his conclusion that Sherrod could perform a significant number of jobs in the national economy. (*Id.* at 13.) The court considers Sherrod's arguments in turn.

**1.     Development of the Record**

An ALJ has a duty to develop a full and fair record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). Before determining that a claimant is not disabled, the ALJ must develop the claimant's complete medical history from at least twelve months preceding the claimant's application date. *Luna v. Shalala*, 22 F.3d 687, 692-93 (7th Cir. 1994); 20 C.F.R. § 404.1512(d). If the ALJ has insufficient evidence on which to determine that a claimant is disabled, or cannot reach a conclusion after weighing conflicting evidence, the ALJ is required to try to obtain additional evidence by requesting additional existing records, recontacting the claimant's medical sources, asking the claimant for more information, or asking the claimant to undergo a consultative examination. *Luna*, 22 F.3d at 693; 20 C.F.R. §§ 404.1512(f), 404.1527(c)(3). The ALJ's decision on how much evidence to gather is entitled to deference. *Luna*, 22 F.3d at 692; *Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir. 1993).

Sherrod contends that the ALJ failed to fully develop a full and fair record in three ways: first, the ALJ had insufficient evidence of Sherrod's ability to walk or stand six hours per day because the ALJ relied on the results of a flawed CE; second, the ALJ ignored evidence of Sherrod's visual impairment and obesity; and third, the ALJ neglected to ask the VE whether her testimony conflicted with the Dictionary of Occupational Titles ("DOT").[27] (Pl.'s Mem., at 10.) The court addresses each issue in turn.

### a. Walking and Standing

Sherrod's first argument has little traction. He asserts that the ALJ "failed to heed" Dr. Zitman's opinion that Dr. Koo's CE was "insufficient for him to render a proper opinion" concerning Sherrod's RFC. (Pl.'s Mem., at 8.) The court does not share this characterization of the ME's testimony. Although Dr. Zitman's certainly criticized Dr. Koo's CE as so poor that it "shouldn't have

---

[27]     The DOT, published by the Department of Labor, provides detailed physical requirements for a variety of jobs. *Prochaska v. Barnhart*, 454 F.3d 731, 735 n.1 (7th Cir. 2006). When determining whether jobs exist in the national economy at step five of the disability test, the SSA takes "administrative notice" of sources such as the DOT. *See id.*; 20 C.F.R. § 416.966(d)(1). SSR 00-4p notes that the SSA will "rely primarily on the DOT . . . for information about the requirements of work in the national economy." SSR 00-4p, 2000 WL 1898704, at *2.

been paid for", (R. 229), and noted that Dr. Koo should have performed a visual acuity test and likely mixed up Sherrod's right and left sides, (R. 228), Dr. Zitman was not unable to form his *own* opinion as to Sherrod's RFC. While Dr. Zitman initially questioned Dr. Koo's determination of Sherrod's ability to walk and stand, stating "walk and stand six hours a day, I question that", (R. 229), he later testified "I'd have to go along with six on the basis of the medical evidence." (R. 230.) Dr. Zitman also opined in more detail as to Sherrod's RFC, testifying as to how much Sherrod could lift and how much he could flex. (R. 229.) In short, Dr. Zitman never indicated that he was unable to render an opinion as to Sherrod's RFC; in fact, he provided an assessment based on the medical records before him, and the ALJ in turn gave "very substantial weight" to that opinion when evaluating Sherrod's RFC. (R. 21.) Thus, the ALJ did not rely, as Sherrod contends, solely on a CE that had been discredited by the ME at the hearing. Even if Dr. Koo's CE was flawed, Dr. Zitman's testimony provided sufficient evidence from which the ALJ could form an opinion as to Sherrod's ability to walk and stand; therefore, the ALJ adequately developed the record on this issue.

### b. Visual Acuity

Sherrod's claim that the ALJ ignored evidence of visual impairment is more persuasive. An ALJ is not required to "discuss every piece of evidence in the record," but may not "ignore an entire line of evidence" that is contrary to the ALJ's finding of non-disability. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (internal citations omitted). In other words, the ALJ cannot "select and discuss only that evidence that favors his ultimate conclusion[,]" *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994), or "mention[] only the medical evidence favoring the denial of benefits." *Zurawski*, 245 F.3d at 888. An ALJ must articulate reasons for rejecting an entire line of evidence, *Herron*, 19 F.3d at 333, because if the ALJ fails to do so, the reviewing court cannot determine whether the ALJ's decision was based on substantial evidence. *Golembiewski*, 322 F.3d at 917.

Sherrod argues that the ALJ improperly ignored an entire line of evidence by recognizing

a problem with Sherrod's vision but failing to analyze its effect on Sherrod's RFC or order further vision testing. (Pl.'s Mem., at 9.) As an initial matter, the court observes that the ALJ's decision cannot be characterized as "ignoring" evidence of Sherrod's visual acuity. In fact, the ALJ noted that Sherrod testified that he needed to wear glasses; that Gladys Isabell wrote that Sherrod has very poor eyesight; that Dr. Kettering remarked that Sherrod's visual acuity may have impaired his ability to recognize symbols on an arithmetic test; and that Sherrod drove to Dr. Kettering's Arlington Heights office without glasses. (R. 20-21.) The cases Sherrod cites, all of which involve decisions where an ALJ failed even to mention evidence of an impairment, or "cherry-picked" only the evidence supporting a determination that the impairment did not constitute a disability, are thus not directly applicable. *See, e.g., Golembiewski*, 322 F.3d at 917-18 (remanding because the ALJ "entirely failed to discuss" medical evidence of incontinence, the decision "contain[ed] no discussion" of the claimant's ability to bend despite conflicting medical opinions on the issue, and the ALJ failed to mention evidence that a hand problem may have developed before the application date); *Zurawski*, 245 F.3d at 888-89 (ALJ, in rejecting claimant's complaints of disabling back pain, "made no mention" of contrary evidence including an MRI and the treating physician's opinion); *Herron*, 19 F.3d at 333-34 (ALJ failed to discuss impairment in claimant's hands and fingers, despite a physician's finding of joint problems and the claimant's testimony of pain and difficulty picking up small objects).

On the other hand, the ALJ's discussion of Sherrod's vision occurred not in the context of evaluating any visual impairment as a stand-alone disability or for its effect on Sherrod's RFC, but as evidence that Sherrod was not actually as illiterate as he claimed to be. (R. 20-21.) Absent from this discussion is any concrete evaluation of Sherrod's vision, which Sherrod, on his DIB application, had alleged as a condition affecting his ability to work. (R. 60.) The fact that Sherrod drives without glasses supports an inference that his eyesight is not as poor as the other evidence suggests, but the ALJ did not comment on this contradiction, nor indeed make any finding as to how serious Sherrod's vision problems actually are. While the ALJ may not have "ignored" evidence of

Sherrod's visual acuity altogether, the ALJ erred by failing to articulate why he chose to disregard this evidence when evaluating Sherrod's impairments or his RFC.  *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (remanding for a new hearing where the ALJ failed to discuss how the claimant's complaints of blurred vision affected her ability to work, and failed to include blurred vision in the list of impairments in questions posed to the VE).  As a result, the ALJ's decision does not allow for meaningful review of Sherrod's eyesight as an independent factor affecting the ALJ's disability determination.  *See Herron*, 19 F.3d at 332 ("meaningful appellate review requires the ALJ to articulate reasons for accepting or rejecting entire lines of evidence.").

The Commissioner contends, however, that there is no medical evidence of actual vision loss, and that the evidence shows in any event that Sherrod's eyesight was correctable because Sherrod testified that he "needed glasses."  (Def.'s Resp., at 8.)  *See* 20 C.F.R. Pt. 404, Sbpt. P, App. 1 § 2.00 (correctable loss of visual acuity not an impairment).  This may be true; but because the ALJ made no finding as to whether Sherrod needed glasses, whether the glasses would correct his vision problem, or indeed whether Sherrod definitively suffered from vision loss, the court cannot even reach the issue of what kind of visual impairment the evidence supports.  In any event, the threshold question is whether the ALJ addressed the evidence at all, and the court concludes  that he did not.

### c.    Obesity

The court turns, then, to the evidence of Sherrod's obesity.  Sherrod has never claimed obesity as an impairment, nor alleged that obesity complicated his medical conditions or affected his ability to work.  He nevertheless argues that the ALJ erred by neglecting to develop the record on this issue.  Even where a claimant does not specifically identify obesity as an impairment, the ALJ is required to consider the matter where the evidence alerts the ALJ to the issue, and should consider obesity in combination with the claimant's other impairments.  *Clifford*, 227 F.3d at 873; *see also* SSR 02-1p, 2000 WL 628049, at *3 (stating that the ALJ "will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the

impairment is severe"). Here, it is true, as Sherrod contends, that the ALJ did not explicitly discuss Sherrod's weight, despite the ME's testimony that Sherrod is "quite obese," (R. 228), and Dr. Koo's observation in his CE that at 5'7-1/2" and 250 pounds, Sherrod was "overweight." (R. 156.) Nonetheless, "a failure to explicitly consider the effects of obesity may be harmless error" where the claimant does not specify how her obesity affects her ability to work or exacerbate her other impairments, and where the ALJ adopts the limitations recommended by physicians who were aware of the claimant's obesity. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006) (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)).

The claimant in *Prochaska* claimed disability from degenerative disc disease and other impairments including depression. *Id.* at 734. Her treating physician, who noted that she suffered from "moderate obesity," provided an assessment of the claimant's ability to stand, walk, bend, and lift. *Id.* The ALJ relied on this doctor's opinion, as well as two other physicians who noted that the claimant was "overweight," in evaluating her physical RFC and ultimately concluding that she was not disabled; the ALJ did not, however, discuss obesity or consider it in combination with the claimant's other impairments. *Id.* at 736-37. Nonetheless, the Seventh Circuit held that the ALJ's adoption of the doctors' reports amounted to "implicit consideration" of the claimant's obesity because those doctors did note her weight. *Id.* at 737. This, combined with the fact that no medical opinion identified her obesity as exacerbating her back injury or other impairments, and the fact that the claimant had neglected to specify how her obesity affected her ability to work, rendered the ALJ's failure to discuss obesity harmless. *Id.*; *see also Skarbek*, 390 F.3d at 504 (finding that "although the ALJ did not explicitly consider obesity, it was factored indirectly into the ALJ's decision" when the ALJ adopted the limitations suggested by doctors who were aware of the claimant's weight); *cf. Clifford*, 227 F.3d at 867, 873 (ALJ committed reversible error by failing to discuss obesity where one doctor had observed that the claimant's high fat diet aggravated her stroke symptoms, and another had recommended that she reduce her fat intake to lose weight and thus reduce her knee pain).

The ALJ in this case relied on the opinions of physicians who were well aware of Sherrod's obesity when they made their recommendations as to Sherrod's physical limitations. Indeed, Dr. Koo and Dr. Zitman provided more than the passing reference to weight that the Seventh Circuit considered sufficient in *Prochaska*: they observed that Sherrod's physique was "well-developed," (R. 156), and "very muscular." (R. 228.) These doctors thus obviously factored in Sherrod's strength and musculature, in addition to his weight, when arriving at their assessments of his physical limitations. Following *Prochaska* and *Skarbek*, the ALJ implicitly considered Sherrod's obesity by adopting their assessments.[28] This implicit consideration, combined with Sherrod's failure to allege or point to evidence showing that his obesity affected his ability to work, renders harmless the ALJ's failure to develop the record with respect to obesity.

The court notes, however, that even where the ALJ did not err in developing the record on this issue, there is an independent question of whether the ALJ should have discussed the effect of Sherrod's obesity in combination with his other impairments. The court will address the latter issue when considering Sherrod's challenge on this point.

### d.    Failure to Inquire About DOT Conflict

Finally, Sherrod contends that the ALJ failed to develop the record by neglecting to ask the VE whether her testimony conflicted with the DOT. (Pl.'s Mem., at 10.) SSR 00-4p requires an ALJ to determine whether a VE's testimony as to the requirements of a particular job is consistent with the DOT. *Prochaska*, 454 F.3d at 735; SSR 00-4p, 2000 WL 1898704, at *2 ("Occupational evidence provided by a VE . . . generally should be consistent with the occupational information supplied by the DOT."). The ALJ must make that inquiry of the VE at the hearing: "At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency." SSR 00-4p, 2000 WL 1898704, at *2.

---

[28]    The ALJ's hypothetical posed to the VE indicates that the ALJ incorporated the observations of Drs. Zitman and Koo: he asked the VE to consider an individual who was "somewhat obese but very muscular." (R. 239.)

Thus, where a VE testifies as to the requirements of a job or occupation, the ALJ "has an affirmative responsibility" to ask about any conflict between that evidence and the DOT, and, if there appears to be such a conflict, to "obtain a reasonable explanation" for the conflict. *Id.* at *4; *see Prochaska*, 454 F.3d at 735 (quoting *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999)) ("Before an ALJ may rely on [VE] evidence to support a determination of nondisability, the ALJ must ask the expert how his or her testimony as to the exertional requirement of identified jobs corresponds with the [DOT], and elicit a reasonable explanation for any discrepancy on this point."). The burden of making this inquiry rests on the ALJ; thus, it is not the claimant's responsibility to raise the issue at the administrative hearing.[29] *Prochaska*, 454 F.3d at 735.

The VE here identified jobs as a machine operator, clothes room worker, or assembler as work that an individual with Sherrod's limitations could perform. The ALJ did not ask whether that testimony conflicted with the exertional requirements for corresponding jobs in the DOT; indeed, the ALJ did not ask about the DOT at all. As set forth in SSR 00-4p, the ALJ was required to inquire about any potential conflict with the DOT. *See Prochaska*, 454 F.3d at 735 ("The Ruling's language unambiguously sets out the ALJ's affirmative duty"). He did not do so here.

The Commissioner argues that the error was harmless because the DOT contains numerous machine operator and assembler positions with "light and unskilled" exertional requirements, consistent with the VE's testimony. (Def.'s Resp., at 13.) The Commissioner did not, at the time she filed her brief, have the benefit of the Seventh Circuit's decision in *Prochaska*, however, which rejected precisely this argument. 454 F.3d at 736. There, as in this case, the ALJ

---

[29]     Prior to *Prochaska*, the Seventh Circuit had indicated that it was the claimant's responsibility to identify, at the hearing, any discrepancy between the VE's testimony and the DOT. *See Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). In *Prochaska*, however, the Seventh Circuit characterized that portion of *Donahue* as dicta (because SSR 00-4p was promulgated after the hearing in that case), noted that other circuits placed the responsibility on the ALJ, and held that the claimant has no duty to raise the issue on her own. *Prochaska*, 454 F.3d at 735. This court observes that *Prochaska's* holding is consistent with the fact that at step five in the disability determination, the burden rests with the Commissioner to show the existence of jobs that the claimant can perform. *See Young*, 362 F.3d at 1000.

did not ask the VE whether his testimony, identifying positions in cashiering, assembly, packaging, and visual inspection, conflicted with the DOT. *Id.* at 735-36. The claimant argued that the requirements listed in the DOT for these jobs exceeded her limitations, and the Seventh Circuit observed that it was not its role to resolve this inconsistency; rather, the ALJ was responsible for developing a record by inquiring as to the DOT requirements and resolving any potential conflict with the VE's testimony. *Id.* at 736. The court remanded with instructions that the ALJ "determine whether the job requirements identified by the [VE] are, in fact, consistent with the definitions in the DOT and [the claimant's] limitations." *Id.*

Here, too, this court is unable to determine, based on the record developed by the ALJ, whether the positions identified by the VE are consistent with the exertional requirements for corresponding jobs listed in the DOT. It was the ALJ's responsibility to make this inquiry of the VE and develop the record on this issue.

### e. Summary

The court concludes that the ALJ did not err by failing to further develop the record as to Sherrod's obesity or his ability to walk and stand. ALJ Kraybill did, however, neglect to develop a full and fair record by failing to properly address the issue of Sherrod's visual acuity, and failed to inquire as to whether the VE's testimony conflicted with the DOT. The court thus remands for further proceedings on these issues.

### 2. Factual Errors, Mischaracterizations, and Unreasonable Inferences

Sherrod contends that the ALJ committed factual errors, mischaracterized certain evidence, and reached unreasonable inferences. (Pl.'s Mem., at 11.) Specifically, Sherrod argues that the ALJ incorrectly stated that Sherrod had failed to report earnings for 1999; unreasonably characterized Sherrod's reports of medication use as contradictory; mischaracterized the medical evidence relating to Sherrod's diabetes and hypertension; and unreasonably inferred, from the fact that Sherrod drove himself to Dr. Kettering's office in Arlington Heights, that Sherrod was not as illiterate as he claimed. (*Id.* at 11-13.) Sherrod contends that these errors undermine the ALJ's

findings as to Sherrod's literacy and credibility, and further that the cumulative effect of these errors requires reversal. (*Id.* at 11, 14, 16.) At this point, the court will discuss only whether such errors in fact occurred, and if so, whether their cumulative effect requires reversal; the court will address their impact on the ALJ's credibility and literacy findings when discussing Sherrod's challenges to those findings.

In reaching his conclusion that Sherrod was not credible, the ALJ noted several inconsistencies between Sherrod's testimony and other evidence in the record. (R. 10, 19, 21.) One purported inconsistency was Sherrod's failure to report or pay taxes on earnings in 1999, despite his admission that he had worked until May 1999. In fact, Sherrod's earnings report shows income of $9,370 from Lichtenberger in 1999. (R. 85-86.) The Commissioner concedes this error. (Def.'s Resp., at 12.)

Sherrod also challenges the ALJ's characterization of an inconsistency between Sherrod's testimony of taking Glyburide every other day and the fact that he checked the "no" box in a form, filed with his request for a hearing, that asked whether he was taking any prescription medication. (R. 107.) Sherrod contends that there is nothing inconsistent about his statement in March 2000,[30] when he requested the hearing, that he was not taking medication, and his testimony in November 2000, that he took Glyburide. (Pl.'s Mem., at 12.) In the court's view, the ALJ's characterization of the testimony as inconsistent is reasonable. Not only did Sherrod testify that he took Glyburide every other day, but the medical records are replete with evidence that he had regularly been taking oral hypoglycemic medication since 1996. (R. 118, 133, 146, 164, 176, 178-79.) Indeed, medical records from March 23, 2000 confirm that Sherrod was taking Glyburide around the time he requested the hearing. (R. 176.) Thus, Sherrod's response on the form was clearly inconsistent with the evidence.

Sherrod further contends that the ALJ mischaracterized the medical evidence relating to

---

[30] Although the form is undated, the SSA received Sherrod's request for a hearing on March 28, 2000. (R. 50.)

Sherrod's diabetes and hypertension. The ALJ characterized Sherrod's diabetes mellitus as "properly controlled on oral medication." (R. 18.) Sherrod argues that the evidence does not support this conclusion because Dr. Zitman testified that he did not know how well Sherrod's diabetes was controlled. (R. 227-28.) The court disagrees. First, while Dr. Zitman indeed stated "I really don't know how well it's controlled," he continued: "but there's certainly no evidence of any end-organ disease." (R. 227-28.) Moreover, the medical history taken during Sherrod's emergency room visit on October 10, 1998 states that Sherrod's diabetes was "controlled with oral hypoglycemics," (R. 132), and the history from his admission for kidney stones on February 24, 1999 observes that Sherrod "has had no complications from the diabetes." (R. 118.) Sherrod points to no evidence, medical or otherwise, that suggests that his diabetes is not controlled. Accordingly, the ALJ did not mischaracterize the evidence as to Sherrod's diabetes.

The ALJ's conclusions as to Sherrod's hypertension are more problematic. In discussing Dr. Zitman's testimony, the ALJ concluded that "[a]lthough the claimant's records indicate some hypertension, it is neither uncontrolled nor has caused no [*sic*] end organ damage." (R. 19.) He also characterized Sherrod's hypertension as "mild." (R. 18.) As Sherrod points out, Dr. Zitman in fact characterized Sherrod's hypertension as "moderate," not "mild," and testified that "the blood pressure went way up" after the fall that resulted in Sherrod's visit to the emergency room in January 2000. (R. 228.) Sherrod himself, when asked if his blood pressure was controlled, answered "well, no," and testified that he became dizzy when bending over, woke up with headaches, and needed medication for his high blood pressure but that he had run out. (R. 213.) It is true that the ALJ did not find Sherrod credible, and the court further observes that Sherrod's medical records do not support his claims of taking hypertension medication; the only reference to such medication is his report to Dr. Mansfield in November 1998 that he took unidentified medication for hypertension, (R. 114), but hypertension medication is not listed among Sherrod's many reports of taking diabetes medication. Nonetheless, the court finds in the record no medical opinion that notes "mild hypertension" with "no end organ damage," or states that Sherrod's

hypertension is "controlled." Dr. Zitman, on whose opinion the ALJ relied, did not so testify.

The Commissioner concedes that Dr. Zitman's testimony does not support the ALJ's characterization, but contends that the error was harmless because the ALJ's determination that Sherrod's hypertension imposed no functional limitations is supported by substantial evidence. (Def.'s Resp., at 9.) The Commissioner notes that other than the high blood pressure readings observed after Sherrod fell in January 2000, Sherrod's blood pressure "ranged from 120/82 to 140/86." (*Id.* at 10 (citing R. 118, 176, 178, 180).) The ALJ did not rely on or even refer to these or any other blood pressure readings in his decision, however. Nor does the Commissioner point to any medical evidence or opinion establishing that these blood pressure readings reflect mild hypertension which imposes no functional restrictions. The court is unwilling to "play doctor" to interpret those readings on its own. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (cautioning that SSA adjudicators "must not succumb to the temptation to play doctor and make their own independent medical findings" and holding that an ALJ erred when he "independently evaluated the evidence" in concluding that the claimant's engaging in a small machine repair and resale business was incompatible with his claimed depression). With no medical evidence supporting the ALJ's characterization of Sherrod's hypertension, and with testimony from both Dr. Zitman and Sherrod that contradicts that conclusion, the court agrees that the ALJ mischaracterized the evidence.

Finally, Sherrod contends that the ALJ "reached an unreasonable inference in regards to the capabilities of illiterate individuals" when he assessed Sherrod's act of driving himself to Dr. Kettering's office in Arlington Heights as inconsistent with a diagnosis of a totally illiterate or mentally retarded individual. (Pl.'s Mem., at 12-13.) Sherrod argues that the evidence does not support the ALJ's assumption that Sherrod was unfamiliar with Arlington Heights or the route to Dr. Kettering's office from Sherrod's Elgin home, and that because the record does not establish how Sherrod found the doctor's office, the ALJ could just have easily reached another inference, such as that a family member told Sherrod where to turn. (*Id.* at 13.) The court finds the ALJ's

conclusion reasonable. There is no evidence that Sherrod *is* familiar with Arlington Heights or the location of Dr. Kettering's office, or that he found the location in any way other than by reading road signs. The record shows that Sherrod had not visited this particular doctor before; indeed, the rest of Sherrod's medical records were generated from visits to doctors and hospitals in Elgin. More significantly, however, the ALJ did not reach this inference on his own; rather, he drew the inference from Dr. Kettering's report. Dr. Kettering, in filling out a Mental Assessment form, answered "no" when asked if Sherrod's ability to understand instructions or respond to supervision and work pressures was affected by his impairments; and when asked "What supports this assessment?" Dr. Kettering noted that he "<u>did</u> <u>not</u> have to give instructions on how to find the office." (R. 194 (emphasis in original).) Thus, Dr. Kettering considered Sherrod's ability to find his office evidence that Sherrod's mental abilities were not severely impaired; this in turn supports the ALJ's inference that Sherrod was not "totally illiterate or mentally retarded." (R. 21.)

In sum, of the factual errors, mischaracterizations, and unreasonable inferences Sherrod alleges, the court finds that only two constitute true errors: first, the ALJ's observation that Sherrod failed to report 1999 earnings; and second, the ALJ's characterization of Sherrod's hypertension as "mild" and "controlled." As to the former, the court does not agree that "this error alone requires reversal of the ALJ's decision." (Pl.'s Mem., at 11.) Although the court will discuss whether this error impacts on the ALJ's determination of Sherrod's credibility, the court does not find that this one factual error, standing alone, is so serious as to render the ALJ's entire decision unreliable. *Cf. Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996) ("When the [ALJ's] decision on matters of fact is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion"). On the other hand, because there is no medical evidence that Sherrod's hypertension is "mild" and "controlled," the court is not satisfied that the ALJ has "buil[t] a rational bridge from the evidence to the finding" that Sherrod's hypertension imposes no functional limitations. *See Barrett v. Barnhart*, 355 F.3d 1065, 1069 (7th Cir. 2004). Accordingly, remand is required for further

assessment of Sherrod's hypertension.

### 3. Literacy

Sherrod contends that the ALJ's conclusion that Sherrod is not illiterate is unsupported by the record. (Pl.'s Mem., at 13-15.) Specifically, Sherrod argues that the ALJ incorrectly applied the regulatory standard for determining illiteracy; relied on unreasonable inferences; failed to make a specific finding of Sherrod's educational level; and ignored the VE's belief that Sherrod was illiterate. Sherrod further argues that the ALJ erred by failing to consider the impact of Sherrod's visual loss on his reading and writing skills, and include that particular limitation in the questions posed to the VE. (*Id.* at 15.) The court concludes that the ALJ's literacy finding is supported by substantial evidence, but that the ALJ failed to properly address the issue of Sherrod's visual acuity in the step five determination.

SSA regulations define illiteracy as an inability to "read or write a simple message such as instructions or inventory lists even though the person can sign his or her name." *See* 20 C.F.R. § 404.1564(b)(1). The ALJ determined that Sherrod is not illiterate because he was "not persuaded that [Sherrod] is unable to read a simple note or do anything more than sign his name." (R. 19.) The ALJ thus applied the correct legal standard. Sherrod argues, however, that Dr. Kettering's comment that Sherrod would "require verbal instruction on tasks to be completed," (R. 194), establishes Sherrod's illiteracy under the above regulatory standard; and, having found Dr. Kettering's opinion "quite persuasive," the ALJ should have given weight to this aspect of Dr. Kettering's report. (Pl.'s Mem., at 13.) The court disagrees. First, that Sherrod would require verbal instruction does not, without more, conclusively establish that Sherrod is unable to read or write a short note. *See Glenn v. Sec'y of Health and Human Serv.*, 814 F.2d 387, 391 (7th Cir. 1987) (noting that "the standard for literacy has been pitched quite low" for purposes of disability determinations, and that under SSA regulations, "to be deemed literate you need only be able to read and write well enough to be able to hold simple, unskilled jobs."). Second, the ALJ gave weight to Dr. Kettering's report not for its conclusions as to Sherrod's mental abilities, which Dr.

Kettering acknowledged were based on "suspect" test results, but for Dr. Kettering's opinion that Sherrod was deliberately portraying himself unfavorably in an attempt to appear more illiterate than he actually was. In other words, the ALJ relied on Dr. Kettering's report as evidence that Sherrod was not credible, and not as substantive evidence that he was literate.

In fact, the ALJ's conclusion that Sherrod was not illiterate was largely based on the fact that Sherrod was not credible in his assertions of illiteracy, and on several inconsistencies between those assertions and the evidence. As noted, the ALJ found persuasive Dr. Kettering's opinion that Sherrod was putting forth less than a wholehearted effort on the mental assessment tests. The ALJ further found some of Sherrod's responses to Dr. Kettering's questions "totally implausible," such as his inability to define a "penny" or provide information about Martin Luther King. (R. 20.) The ALJ also noted an inconsistency between the results of Dr. Kettering's tests, indicating that Sherrod was mentally retarded, and Dr. Mansfield's observation that Sherrod was of "normal intelligence." (*Id.*) The ALJ considered Sherrod's ability to drive himself to Dr. Kettering's office inconsistent with the test results, an inference that, as noted above, the court does not find unreasonable. Another inconsistency, which the ALJ considered "noteworthy," was the fact that Sherrod started to spell Dr. Garb's name in his testimony. (*Id.*) Although Sherrod got only as far as "G-O-R", it was not unreasonable to infer from Sherrod's attempt that he was not totally illiterate. In addition to credibility concerns and inconsistencies, the ALJ noted the lack of any other evidence of Sherrod's illiteracy. He correctly observed that nothing in the medical records indicated that Sherrod was illiterate, and that Dr. Garb's note that Sherrod "states cannot read or write" was merely a recitation of what Sherrod told Dr. Garb, not a reflection of Dr. Garb's own opinion. The ALJ found unpersuasive the note from Sherrod's daughter, observing that an inability to help children with homework is not necessarily indicative of an inability to read or write.[31] Finally, the ALJ noted that

---

[31] It is noteworthy that both Dr. Garb's note, and the letter from Sherrod's daughter stating that Sherrod has never been able to read or write, were submitted after the hearing, where it became clear, from the exchange between the ALJ and the VE, that a finding of illiteracy would be the difference between a finding of "disabled" or "not disabled" under the Grid Rules. (R. 240.)

Gladys Isabell wrote that Sherrod cannot read or write "anymore," and drew the inference that perhaps poor vision, not illiteracy, was affecting Sherrod's ability to read or write.

In short, the ALJ's determination that Sherrod is not illiterate finds ample support in the record, and was largely based on a credibility determination that the court cannot characterize as "patently wrong." The court thus finds no error in the ALJ's conclusion. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2001) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990)) ("We will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'").

Sherrod's remaining arguments as to the ALJ's literacy finding are unavailing. He contends that the ALJ erred by failing to make a specific factual finding as to what grade Sherrod completed in school. (Pl.'s Mem., at 14.) As the ALJ noted, Sherrod testified as to a third-grade education, but elsewhere reported having a sixth-grade education, (R. 10, 189), and testified that he attended a one-room schoolhouse where "they would give you like, I guess two grades or three grades . . . . they would just pass you on down, which if you could read or write either way . . . ." (R. 209.) The court cannot fault the ALJ for being unable to determine a precise grade level based on this evidence. More importantly, however, SSA regulations instruct an ALJ to determine a claimant's education level by categories, such a "marginal education," "limited education," or "high school education." *See* 20 C.F.R. § 404.1564(b). The ALJ concluded only that Sherrod had a "marginal education," (R. 23), which the regulations define as "formal schooling at a 6th grade level or less." 20 C.F.R. § 404.1564(b)(2). It is thus immaterial which grade Sherrod completed, so long as it was the sixth grade or less; and the evidence supports a finding that Sherrod had either a third- or sixth-grade education, or somewhere in between.

It is also immaterial that the VE initially assumed that Sherrod was illiterate and that Grid Rule 202.09 would require a finding that he was disabled. (R. 240.) Sherrod contends that the VE could only "come up with jobs" Sherrod could perform "when instructed to ignore her own assessment of [Sherrod's] ability to read and write." (Pl.'s Mem., at 15.) The VE's "own assessment" of Sherrod's literacy is irrelevant; her task was to answer the hypothetical as the ALJ

posed it to her, and the ALJ instructed her to consider a claimant who was literate.

Finally, Sherrod contends that visual impairments impinge on his ability to read and write, and that the ALJ thus erred by failing to include a visual impairment factor in the vocational profile posed to the VE in the hypothetical. (Pl.'s Mem., at 15.) At step five in the disability determination, the burden of proof shifts to the Commissioner to show that the claimant can successfully perform a significant number of jobs that exist in the national economy. *See* 20 C.F.R. § 404.1560(c); *Young*, 362 F.3d at 1000 (citing *Zurawski*, 245 F.3d at 886). Where an ALJ relies on testimony from a VE to determine whether such jobs exist, and whether a person like the claimant can perform them, "the question posed to the expert must incorporate all relevant limitations from which the claimant suffers." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003).

As explained earlier, the court has concluded that, on the issue of Sherrod's visual acuity, the record is incomplete. Absent an assessment of this impairment, the court cannot determine whether the ALJ should have included vision loss in the hypothetical posed to the VE. Upon remand, the ALJ, after determining the nature of Sherrod's visual impairment, if any, will be in the best position to determine its effect on his ability to read and write.[32]

### 4.    Credibility

An ALJ is in the best position to determine a claimant's truthfulness and forthrightness. *Skarbek*, 390 F.3d at 504. Therefore, the ALJ's credibility determination is afforded "special

---

[32]    The Commissioner, citing SSR 85-15, contends that the ALJ's failure to consider Sherrod's visual impairment was harmless in any event. (Def.'s Resp., at 8.) SSR 85-15 provides as follows:

> As a general rule, even if a person's visual impairment(s) were to eliminate all jobs that involve very good vision (such as working with small objects or reading small print), as long as he or she retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in a workplace), there would be a substantial number of jobs remaining across all exertional levels.

SSR 85-15, 1985 WL 56857, *8. This ruling may prove instructive once Sherrod's level of visual acuity is known; it does not relieve the ALJ of the responsibility to develop the record regarding Sherrod's visual impairment in the first place, where Sherrod has alleged vision loss as a condition affecting his ability to work. (R. 63.) *See Indoranto*, 374 F.3d at 474.

deference" and will be reversed only if the claimant can show it was "patently wrong." *Powers*, 207 F.3d at 435. SSR 96-7p provides, however, that the ALJ must provide "specific reasons" for a credibility finding, and cannot merely state that the claimant's allegations "have been considered" or that they are or are not credible. *Golembiewski*, 322 F.3d at 915 (quoting SSR 96-7p, 1996 WL 374186). Thus, the ALJ's credibility determination will be affirmed "as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek*, 390 F.3d at 505. Here, Sherrod contends that the ALJ's determination that Sherrod was not credible was error for two reasons: first, the ALJ based his credibility determination on inconsistencies that were, in fact, not inconsistencies at all; and second, the ALJ failed to consider the credibility factors mandated by SSR 96-7p. (Pl.'s Mem., at 15-16.)

Sherrod's first argument has little merit. The ALJ found Sherrod not credible based on several "troublesome inconsistencies that belie the claimant's veracity." (R. 19.) Sherrod argues that these inconsistencies either do not exist or are predicated on unreasonable inferences. (Pl.'s Mem., at 16.) In particular, Sherrod points to the ALJ's factual error in finding that Sherrod had not reported his 1999 earnings, and further argues that there was nothing inconsistent about Sherrod's reports of medication use, his testimony as to his education and work history, or the fact that he drove to Arlington Heights unassisted. (Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment and Plaintiff's Response to Defendant's Motion for Summary Judgment (hereinafter "Pl.'s Reply"), at 6-7.) As explained earlier, however, the court has, upon reviewing the record, concluded that the ALJ did not, except for the factual error with regard to Sherrod's 1999 earnings, reach unreasonable inferences or incorrectly identify inconsistencies. Sherrod's indication that he took no prescription medication in March 2000 indeed conflicts with a long history of oral diabetes medication and his testimony at the hearing that he took such medication. Of course, the most reasonable explanation for the discrepancy is simple error in filling out the form, rather than deliberate misleading; accordingly, the ALJ did not give this inconsistency dispositive weight, but only included it last in a long list of discrepancies. (R. 21.) More serious,

and receiving no mention in Sherrod's briefs, is the ALJ's reliance on Dr. Kettering's conclusion that Sherrod was malingering during his psychological evaluation. Indeed, the ALJ found the results of this examination "quite persuasive," noting that the extremely poor test results and Sherrod's responses to Dr. Kettering's questions suggested a level of functioning that was completely implausible or contradicted by other evidence in the record. (*Id.*)

Other inconsistencies noted by the ALJ find clear support in the record as well. Sherrod's testimony that he received only a third-grade education, after reporting to physicians that he completed the sixth grade, is clearly contradictory; moreover, his attempt to explain the discrepancy, as noted above, was unhelpful, if not incomprehensible. The ALJ, who observed Sherrod's explanation firsthand, is entitled to deference on this point of credibility. Furthermore, the evidence of Sherrod's work for Lichtenberger reveals glaring inconsistencies that reflect poorly on Sherrod's credibility. Although Sherrod and his attorney at the hearing vehemently maintained that Sherrod stopped working in May 1999, Sherrod reported to medical staff in his emergency room visit in January 2000 that he was employed by Lichtenberger, that his occupation was construction, and that he had fallen while "scraping a house in St. Charles." (R. 159-60.) When the ALJ questioned Sherrod about this discrepancy, he testified that he had fallen in January 1999, not January 2000—an assertion that was clearly untrue given the hospital records. Sherrod now argues that he was not actually working in January 2000, but considered himself still employed by Lichtenberger because there was a chance he could get called to work again. (Pl.'s Resp., at 6.) Sherrod fails to explain, however, what he was doing scraping a house in a town miles away from his Elgin home; the only reasonable inference, which the ALJ drew, was that Sherrod was working. The court also notes that on June 11, 1999, Sherrod reported to State agency physician Dr. Koo that he had not returned to work after the generator-lifting incident in October 1998, (R. 155), an assertion belied by both the evidence of his employment with Lichtenberger and his own sworn testimony that he worked until May 1999. Finally, as noted earlier, the ALJ did not unreasonably infer that Sherrod was more literate than he claimed from the fact that Sherrod drove himself

unassisted to Arlington Heights, particularly as Dr. Kettering emphasized that fact in his report; nor was it unreasonable for the ALJ to take note of Sherrod's attempt to spell Dr. Garb's name.

Sherrod's argument that the ALJ nonetheless failed to follow the requirements of SSR 96-7p is similarly unavailing. SSR 96-7p establishes a framework for "evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness." SSR 96-7p, 1996 WL 374186, at *2. It requires that, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown," the ALJ "must make a specific finding on the credibility of the individual's statements based on a consideration of the entire case record." *Id.* Where the claimant's symptoms "suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone," the ALJ must consider factors such as the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and any other functional restrictions. *Id.* at *3; *Scheck*, 357 F.3d at 703. The ruling emphasizes that "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p, 1996 WL 374186, at *5.

Here, as noted, the ALJ based his credibility determination on inconsistencies. Sherrod contends that this reliance on inconsistencies was insufficient, and that the ALJ erred by neglecting to discuss the other factors listed in SSR 96-7p, including Sherrod's daily activities, long work record, and the nature and intensity of his pain. (Pl.'s Reply, at 8.) The ALJ made his credibility finding, however, in the context of Sherrod's claim of illiteracy, and not as to any claim of pain or other medical symptoms. It is not at all clear that SSR 96-7p requires an ALJ to consider the factors set forth in the ruling when determining the credibility of a claimant's claim of illiteracy. Indeed, the ruling contemplates physical symptoms "such as pain, fatigue, shortness of breath, weakness, or nervousness." SSR 96-7p, 1996 WL 374186, at *2; *see also Walker v. Barnhart*, 127 Fed. Appx. 207, 211 (7th Cir. 2005) (noting that SSR 96-7p "lays out seven factors to consider in making credibility determinations regarding an individual's self reporting of medical symptoms").

The cases Sherrod cites, in which the Seventh Circuit held that an ALJ erred by failing to address the factors listed in SSR 96-7p, involve credibility determinations regarding allegations of disabling pain. *See, e.g., Golembiewski*, 322 F.3d at 915 (ALJ, without explanation, declined to credit claimant's testimony of severe seizures of pain occurring on a weekly basis); *Zurawski*, 245 F.3d at 887 (noting the requirements imposed by SSR 96-7p when there are inconsistencies between the medical evidence and the claimant's allegations of disabling pain). Sherrod cites no authority, and this court can locate none, holding that an ALJ must consider the SSR 96-7p factors when determining that a claimant's literacy allegations are not credible. Indeed, a discussion of factors such as "location, duration, and frequency" of symptoms, or medication use, when the complained-of symptom is illiteracy, would make little sense.

Moreover, even where an ALJ discredits a complaint of pain, it does not appear that the ALJ is required to discuss every factor listed in SSR 96-7p. In *Skarbek*, the ALJ provided only two reasons for finding the claimant not credible regarding his limitations: first, the claimant's testimony of throbbing pain was inconsistent with the medical evidence; and second, the claimant's testimony as to his daily activities did not support a finding that he was totally disabled. 390 F.3d at 505. The Seventh Circuit held that the ALJ had thus complied with SSR 96-7p's requirement that he give specific reasons for his findings. *Id.*; *see also Patterson v. Barnhart*, 428 F. Supp. 2d 869, 880 (E.D. Wis. 2006) (noting that "SSR 96-7p does not require the ALJ to analyze and elaborate on each of [the listed] factors when making a credibility determination," so long as the ALJ "sufficiently articulate[s] her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning.").

Sherrod's reliance on *Golembiewski* is misplaced. There, the ALJ found the claimant's testimony not credible "for the reasons set forth in the body of the decision," but provided no explanation at all as to why he considered the claimant's allegations of pain seizures to be unbelievable. *Golembiewski*, 322 F.3d at 915. The Seventh Circuit held that SSR 96-7p required the ALJ to *specify* the reasons for his finding, and rejected the Commissioner's argument that the

ALJ's reasoning could be "implied" from the rest of the decision. *Id.* at 916 (emphasis in original).
Here, in contrast, the ALJ clearly specified the inconsistencies that supported his finding that
Sherrod was not credible—inconsistencies which, for the most part, find ample support in the
record. The Commissioner does not ask the court to imply the reasoning behind the ALJ's
credibility determination; the ALJ's reasoning was explicit. Given the importance that SSR 96-7p
places on the consistency of a claimant's statements when making a credibility finding, *see* SSR
96-7p, 1996 WL 374186, at *5, the ALJ's reliance on inconsistencies demonstrates sufficient
compliance with SSR 96-7p under these circumstances.[33]

Because the ALJ provided specific reasons for declining to credit Sherrod's claims of
illiteracy, and because those reasons find support in the record, the court cannot conclude that the
ALJ's credibility determination was "patently wrong." *See Skarbek*, 390 F.3d at 504-05. The court
therefore grants summary judgment for the Commissioner as to the ALJ's credibility finding.

### 5. Consideration of Impairments in Combination

An ALJ is required to consider the combined effect of a claimant's ailments. *Gentle v.
Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005); *Barrett*, 355 F.3d at 1068 (collecting cases); 20 C.F.R.
§ 404.1523. Once the ALJ has found that at least one of a claimant's impairments is "severe," the
ALJ must consider the aggregate effect of all the claimant's ailments and conditions, including those
that are not severe, or that would not be independently disabling. *Gentle*, 430 F.3d at 868;
*Golembiewski*, 322 F.3d at 918. Sherrod argues that the ALJ ignored all but Sherrod's back
problems in his formal findings, and never considered those back problems in combination with
Sherrod's diabetes, hypertension, obesity, and vision loss. (Pl.'s Mem., at 16-17.) The

---

[33] The court further observes that the ALJ did consider Sherrod's daily activities, noting
that the mere fact that Sherrod's daughter does the laundry and goes grocery shopping does not
establish that Sherrod is unable to do so. (R. 19.) The ALJ also noted Dr. Koo's observation that
there were no physical findings that explained Sherrod's pain complaints. (R. 19.) Nonetheless,
it appears that the ALJ credited those complaints: Sherrod told Dr. Koo that he could not lift over
20 or 30 pounds because of back pain, (R. 156); Dr. Zitman agreed with that assessment, (R. 229);
and the ALJ adopted that assessment by adopting the RFC recommendation of both doctors that
Sherrod retained the RFC for "slightly restricted range of light work." (R. 19.)

Commissioner responds that the ALJ properly considered the aggregate effect of Sherrod's ailments because he discussed all of Sherrod's medical problems in the body of his decision, his RFC assessment was "based upon the record in its entirety," (R. 19), he made his findings "after careful consideration of the entire record," (R. 23), and he relied on Dr. Zitman, who did consider all of Sherrod's ailments. (Def.'s Resp., at 10.) Citing *Sims v. Barnhart,* 309 F.3d 424, 432 (7th Cir. 2002), the Commissioner further argues that the ALJ discharged his duty by including all of Sherrod's ailments in the hypothetical posed to the VE. (Def.'s Resp., at 10.)

The court is not persuaded that the ALJ considered the aggregate effect of Sherrod's disc disease, hypertension, diabetes, obesity, and vision loss on his ability to work, mostly because the ALJ did not articulate having done so. In the court's view, boilerplate assertions of having considered the record in its entirety are insufficient to allow meaningful review of how the ALJ evaluated the combined effect of Sherrod's specific impairments. *See Gentle*, 430 F.3d at 868-89 (holding that the ALJ erred by failing to articulate how the claimant's obesity affected her disc disease; how that, in combination with her allergies and concentration problems, would in turn affect her depression and anxiety; and how the total effect of these ailments would impact her ability to work). Moreover, until the ALJ develops a full and fair record on the issue of Sherrod's visual acuity, the ALJ cannot be said to have properly evaluated Sherrod's impairments in concert.[34]

---

[34] The court recognizes some tension between *Prochaska*, 454 F.3d at 736-37, which holds that a failure to discuss obesity is harmless where the ALJ relied on the opinions of physicians who had considered the claimant's obesity and where the claimant failed to specify how obesity affected her ability to work, and *Gentle*, 430 F.3d at 868-89, which held that the ALJ, in fulfilling the duty to consider impairments in combination, should have considered the effect of the claimant's obesity on her disc disease. In *Gentle*, however, unlike in *Prochaska*, the ALJ does not appear to have relied on an RFC assessment from physicians who were aware of the claimant's obesity. Moreover, Judge Posner in *Gentle* noted that "[c]onditions must not be confused with disabilities" and that obesity is not a disability or impairment on its own; rather, it can exacerbate another impairment or affect a claimant's ability to work. 430 F.3d at 868. As this court reads those cases, it appears that an ALJ is not required to discuss or develop a record as to obesity as an independent impairment, so long as the ALJ considers obesity with respect to the ultimate question of a claimant's ability to work; and where the ALJ fails to explicitly discuss obesity, the ALJ will not have committed reversible error if the ALJ meets the requirements of *Prochaska*. Nonetheless, given the Seventh Circuit's insistence on considering a claimant's conditions in the aggregate, an ALJ would be wise to discuss how obesity affects a claimant's other impairments and RFC. *See*

*Sims* does not mandate a different conclusion. There, the Seventh Circuit held that the ALJ had adequately considered the claimant's impairments in combination by ensuring that the VE took into account all of the claimant's ailments when considering whether there were jobs that the claimant could still perform. *Sims*, 309 F.3d at 432. The Seventh Circuit did not, however, enthusiastically endorse this approach; rather, it found the ALJ's evaluation "acceptable" but cautioned that "we urge the SSA in the future to carefully examine the issue of disability in light of a claimant's total impairments." *Id.* More importantly, the ALJ in this case did not include any reference to visual impairment in the list of impairments posed to the VE; thus, the ALJ did not ensure that the VE considered "all" of Sherrod's impairments in combination. Upon remand, once the ALJ has made a finding as to Sherrod's vision problems, if any, the ALJ must indicate how the combination of Sherrod's impairments affect his ability to work.

<u>CONCLUSION</u>

For the foregoing reasons, Sherrod's motion for summary judgment (12) and the Commissioner's motion (15) are granted in part and denied in part. The Commissioner's decision to deny benefits is affirmed in part and reversed in part, and this matter is remanded to the Commissioner for further proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. § 405(g). Upon remand, the ALJ should (1) explain his reasoning for not evaluating Sherrod's vision as an independent impairment and for disregarding evidence of visual impairment when analyzing Sherrod's RFC, and, if required, further develop the record on this issue; (2) determine whether the job requirements identified by the VE are consistent with the definitions in the DOT and Sherrod's limitations; (3) re-evaluate evidence of Sherrod's hypertension; and (4) consider Sherrod's impairments in combination.

ENTER:

_Rebecca R. Pallmeyer_

---

*Gentle*, 430 F.3d at 868; *Barrett*, 355 F.3d at 1068.

Dated: November 16, 2006

_____
REBECCA R. PALLMEYER
United States District Judge